UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BART LANGLEY,                          )
                                       )
    Plaintiff                          )
                                       )
v.                                     )    1:11-cv-00071-DBH
                                       )
SOCIAL SECURITY ADMINISTRATION         )
COMMISSIONER,                          )
                                       )
    Defendant                          )

## REPORT AND RECOMMENDED DECISION

The Social Security Administration found that Bart Langley has severe degenerative disk disease but retains the functional capacity to perform substantial gainful activity in occupations existing in significant numbers in the national economy, resulting in a denial of Langley's application for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act. Langley commenced this civil action to obtain judicial review of the final administrative decision. I recommend that the Court affirm the administrative decision.

### THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the September 20, 2010, decision of Administrative Law Judge John L. Melanson because the Decision Review Board did not complete its review during the time allowed. Judge Melanson's decision tracks the familiar, five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. §§ 404.1520, 416.920. (Docs. Related to Admin. Process, Doc. No. 10-2, R. 1, 6-18.[1])

At step 1 of the sequential evaluation process, the Judge found that Langley last met the

---

[1] The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 10.

insured status requirements of Title II on December 31, 2006, and has not engaged in substantial gainful activity since November 13, 2002, the date of alleged onset of disability. (R. 9, Findings 1 & 2.)

At step 2, the Judge found that Langley suffers from a solitary "severe" physical impairment of degenerative disk disease of the lumbar spine. (R. 9, Finding 3.) The Judge deemed non-severe migraine headaches, attention deficit hyperactivity disorder, and alleged psychiatric conditions. As to the allegations of psychiatric impairment, the Judge assessed no-to-mild limitations in the relevant categories of mental functioning. (R. 10.) At step 3, the Judge found that the combination of impairments would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P, specifically considering listing 1.04, disorders of the spine, but also considering the potential impact of a body mass index between 27 and 33, in a professed "abundance of caution." (R. 11, Finding 4.)

Prior to further evaluation at steps 4 and 5, the Judge assessed Langley's residual functional capacity. The Judge found that Langley's combined impairments result in the following capacity:

> To perform less than the full range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), such that he must be allowed to sit or stand at will; [to] occasionally climb ramps and stairs but never ladders, ropes or scaffolds; [to] occasionally balance, stoop, and crouch but never kneel or crawl.

(R. 11, Finding 5.) This capacity is further restricted by a requirement that Langley "avoid hazardous work environments with unprotected heights or moving machinery" and also "moderate exposure to irregular or sloping work surfaces." (Id.)

At step 4, the Judge found that this degree of limitation precluded past relevant work as a corrections officer or tractor trailer driver because of the exertional demands of such work. (R.

2

15, Finding 6.) For purposes of the step 5 analysis, the record establishes that Langley was born in 1966 (making him a "younger individual"), has at least a high-school education, and can communicate in English. Given Langley's presentation, the transferability of job skills is not material to the step 5 determination. (R. 16, Findings 7-9.) The Judge presented a vocational expert with this vocational profile and the residual functional capacity findings and found, based on the vocational expert's hearing testimony, that Langley could still engage in other substantial gainful employment, including as a warehouse order caller, assembler of small products, touch-up screener, routing clerk, and maintenance dispatcher. As for the dispatcher job, the Judge noted a discrepancy between the vocational expert's testimony and the information found in the Dictionary of Occupational Titles, but found that the vocational expert explained the conflict based on the fact that Langley's past work in corrections and truck driving would not be unlike the duties involved in the dispatch occupation. (R. 17, Finding 10.) Because the Judge found that Langley could transition to other work despite his impairment, Langley was found not disabled. (R. 17, Finding 11.)

## DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

Langley argues that the Judge erred in his residual functional capacity finding and that, consequently, the vocational expert testimony that underlies the step 5 finding depends on a "seriously flawed RFC hypothetical." (Statement of Errors at 8, Doc. No. 12.) This argument rests on many sub-arguments that will be addressed after a recitation of the expert medical opinion evidence.

### A. Standard of Review

The Court must affirm the administrative decision so long as it applies the correct legal standards and is supported by substantial evidence. This is so even if the record contains

evidence capable of supporting an alternative outcome.  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam);  Rodriguez Pagan v. Sec'y of HHS, 819 F.2d 1, 3 (1st Cir. 1987).  Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding.  Richardson v. Perales, 402 U.S. 389, 401 (1971);  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

### B. Expert Assessments of Record

Mr. Langley was involved in a motor vehicle accident in late 2002 and suffers from chronic back and right hip pain.  The MRI report associated with his treatment describes disk bulging at L3-4 and L5-S1.  It also describes mild degenerative joint disease at L1 through L4 and at L5-S1.  The L3-4 disk space shows "mild to moderate acquired spinal stenosis and bilateral neural foraminal stenosis."  (Ex. 1F, R. 397.)    The following relevant expert assessments are found in the record.

*Ex. 5F:  Dr. Stucki's Physical RFCA dated 12/01/06*

Paul Stucki, Ph.D., provided Maine Disability Determination Services with a physical residual functional capacity assessment based on his review of medical records compiled through October 11, 2006.  (R. 488.)  He identified both degenerative disk disease and joint disease as the relevant severe impairments and assessed a restriction to light exertion, 6 hour sit, 6 hour stand/walk, a capacity to frequently assumed work-related postures, but to balance only occasional.   (R. 481-83.)

*Ex. 6F: Dr. Hoch's PRTF dated 12/06/06*

Scott Hoch, Ph.D., performed the Commissioner's psychiatric review technique in light of his review of medical records compiled through October 11, 2006. He concluded that Langley's alleged mental impairment is not severe for vocational purposes, identifying only mild ADHD. (R. 489-90.) He assessed no mental restrictions concerning activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, and pace. (R. 499.) Dr. Hoch did not find a need for a mental residual functional capacity assessment.

*Ex. 10F: Dr. Gates's First CE dated 12/18/07*

Donna Gates, Ph.D., performed a consultative examination of Langley in December 2007 on referral from Maine Disability Determination Services for clinical interview, mental status examination, and diagnosis. Dr. Gates ultimately did not offer a psychiatric diagnosis, but identified "chronic pain" as an Axis IV concern. She offered a global assessment of functioning score of 70. Dr. Gates found Langley to be capable of following work rules and relating well to others. She opined that his judgment would be adequate for jobs within his vocational ability. She found that Langley likely can manage a mild level of work related stress and complete detailed job instructions. She described Langley as someone with some reactive depressed mood in relation to lifestyle changes and some challenge with concentration and memory that likely arises as a side effect from pain medication. She opined that Langley would be a reliable worker for work within his physical ability.

*Ex. 11F: Dr. Lester's PRTF dated 12/20/07*

Lewis Lester, Ph.D., supplied a psychiatric review technique form on request from Maine Disability Determination Services. He reviewed the mental health records through Dr. Gates's

November 2007 report. (R. 554.) Dr. Lester identified the relevant diagnosis as an affective disorder described as depressive disorder NOS, but opined that the impairment is not severe for social security purposes. (R. 542, 545.) He assessed that there is insufficient evidence of ADD. (R. 554.) He characterized the associated mental limitations as "mild and non-severe by Maine Disability Determination Services criteria." (Id.)

*Ex. 13F: Dr. Harshman's CE of 1/24/08*

Edward Harshman, M.D., performed a consultative examination for Maine Disability Determination Services. He found that Langley's right sacroiliac joint is painful and possibly loose, that there is probably a poorly healed compression fracture at T8 and that both conditions "can be definitively treated." Assuming that Langley was not likely to improve, Dr. Harshman assessed a capacity to sit and stand freely and to engage in light exertion, but not to stoop, crouch, or crawl. (R. 558.)

*Ex. 14F: Dr. Nielson's Physical RFCA dated 2/15/08*

Iver Nielson, M.D., supplied Maine Disability Determination Services with a physical residual functional capacity assessment. According to Dr. Nielson, the records indicate the existence of sciatica, two herniated disks, and "degenerative bone disease, right hip." (R. 559.) He assessed a capacity for light exertion, 6 hours sitting in an 8-hour workday, 6 hours of walking or standing, ruled out ladders, ropes, scaffolds, kneeling and crawling, but found an ability to adopt other postures on an occasional basis. (R. 560-61.) Dr. Nielson also specified that Langley must avoid exposure to hazards such as irregular, uneven walking surfaces. (R. 563.) According to Dr. Nielson, the "[o]bjective evidence fails to fully support the magnitude of [Langley's] complaints/allegations." (R. 564.)

*Ex. 15F: Dr. Chamberlin's Physical RFCA dated 6/16/08*

Four months after Dr. Nielson's physical RFC assessment, Maine Disability Determination Services sought another assessment from Richard Chamberlin, M.D., based on Langley's request for reconsideration. Dr. Chamberlin's assessment of functional capacity was the same as Dr. Nielson's (R. 568-71), except that he called for regular rest periods every two hours (R. 569). Dr. Chamberlin noted that methadone provides relief for chronic pain symptoms. According to Dr. Chamberlin, Langley's "alleged degree of pain and disability consistently seems out of proportion to the objective findings as documented in his primary physician's office notes." (R. 572.)

*Ex. 16F: Dr. Hoch's PRTF dated 7/01/08*

Scott Hoch, Ph.D., conducted the psychiatric review technique for purposes of reconsideration. Like his review 17 months prior, he once more concluded that the mental health evidence reflected a non-severe degree of impairment for social security disability purposes, but he reclassified the extant condition as "depression (NOS)." (R. 575.)

*Ex. 20F: Nurse Practitioner Childs's MSS dated 10/20/09*

Kathleen Childs, FNP-C, a treatment provider, supplied the Commissioner with a medical source statement. She wrote "unknown" under most questions on the form. She indicated, in sum, that Langley would have to periodically alternate position, lacks mobility to some degree, takes methadone for pain control, and takes Adderall for ADHD. She also identified chronic pain syndrome as a relevant consideration for mental impairment, but did not assess the degree of impairment. (R. 610-11.)

*Ex. 22F: Dr. Gates's Second CE dated 10/16/09*

Maine Disability Determination Services sought a second consultative examination from Dr. Gates. Following her second consultation with Langley, Gates diagnosed "adjustment reaction with mixed depressed mood and anxiety features (nonclinical)," with a GAF score of 70. She noted that Langley was complaining of migraines in addition to chronic back pain. Dr. Gates opined that there was no indication of malingering on Langley's part and that he did not appear to be exaggerating the nature of his physical or emotional complaints. (R. 616.) According to Dr. Gates, Langley's physical restrictions are the source of any appreciable mental impairment. However, in the course of reciting the view that Langley is psychiatrically fit for mental work activity, Dr. Gates observed: "[H]e is able to manage a mild level of work-related stress and function independently on simple jobs." (R. 617.)

*Ex. 23F: Dr. Phelps's "Complete General Medical Physical Examination Report" dated 12/10/09*

Langley's counsel obtained a physical examination from Robert N. Phelps, Jr., M.D., including a review of the medical records. Dr. Phelps described the back impairment as follows:

> Multilevel degenerative disc disease lumbosacral spine with mild to moderate acquired spinal stenosis with bilateral neural foraminal stenosis at L3-4 due to a broad based disc bulge, a mildly prominent left central and left parasagittal disk bulge at L5-SI with mild acquired spinal stenosis and moderate encroachment on the left lateral recess at that level, and mild degenerative joint disease L1-L4 and at L5-SI, with a mild left convex scoliosis with on clinical examination a moderate left lumbar scoliosis, sensory radicular findings on the left in the L5 and SI nerve root distribution, pain on straight leg raising on the right, contralateral pain on straight leg raising on the left, and weakness of dorsiflexion at the right ankle.

(R. 626.) Dr. Phelps also noted a history of migraines described as follows:

> His migraines are disabling in that he cannot keep his eyes open for any length of time due to light sensitivity. He lies down and stays in the dark. He gets migraines on the average 10 times a month. They can last anywhere from hours to most of the day.

8

(R. 622.) Dr. Phelps offered a medical source statement to the effect that Langley has less than 10 pounds lifting capacity, can stand for less than 2 hours, sit for less than 6 hours, is markedly limited in the use of his upper and lower extremities, and can assume work-related postures only "rarely." Dr. Phelps explained:

> The combination of pain and weakness of the right leg interfere with lifting and carrying, standing and walking, sitting, and pushing and pulling (the ability to push/pull is dependent on a pain free low back).
> \*\*\*
> The combination of pain and weakness of the right leg impose postural limitations.

(R. 627.) Dr. Phelps additionally opined that Langley's attention and concentration will be negatively impacted by pain. (Id.)

*Dr. Webber's Testimony at the 7/14/10 Hearing*

Judge Melanson called Peter Webber, M.D., as a medical expert at Langley's hearing. After describing the medical records in general terms, Dr. Webber indicated:

> [I]t's fair for me to say he does have a chronic pain disorder and I think it's based in part on some degenerative changes in his lumbar spine without physical findings, laboratory findings, to document any neurologic component to it. And I think based on limited physical examinations he does have some problem with either his sacroiliac or his hip joint but, again, it's not clear to me.

(R. 88-89.) Dr. Webber next testified that, in terms of depression, there are not "any ongoing evaluations or ongoing counseling that would help me make [a] determination" of any worsening adjustment reaction or disorder subsequent to Dr. Gates's opinion of October 2009. (R. 89.) Judge Melanson then asked that Dr. Webber consider the evidence of migraine headaches. Dr. Webber responded:

> A. Well, migraine has been, has been mentioned by several different examiners over a period of time. I don't know when the first time it was brought forward as a diagnosis and, let me just review what I've got here. It didn't seem in the notes that it was an overwhelming issue so I didn't, the only thing I've got, have down

9

here is McDonald in Exhibit 19, that was Sebasticook between '08 and '09.
There was an M.D., PhD, McDonald and a Ford nurse practitioner. And during
that time frame, I didn't see much regarding migraine. That to me seems to be
somewhat a more recent problem.

(R. 89.) Asked to evaluate Dr. Phelps's contribution to the record, Dr. Webber testified:

There's, there's a discussion of migraine, to me appears to be limited to one or
two sentences. He said it's disabling. And he gets it about ten times a month and
lasts anywhere from hours to most of the day. He uses Maxalt for that. So that he
does comment on that. That is not something that you can easily evaluate by
physical examination.

As for spine and joint impairment, Dr. Webber observed that:

[T]he neurologic and orthopedic examination was a lot of unable to do this and to
do that. But here, again, I had trouble organizing it with the findings on the
physical examination. So although there's nothing that glares out at me as such, it
just, I was a little troubled by some of the comments about it.

(R. 90.) He explained:

I just had a little trouble agreeing with everything that he said. I think he tended
to, I'm not sure why he's less than 10 pounds as far as being able to lift and carry.
That seemed to be somewhat over restrictive to me.

(R. 91.) Judge Melanson asked Dr. Webber to consider Dr. Chamberlin's residual functional

capacity assessment of an ability to engage in light work, by comparison. Dr. Webber opined:

I think I would place him a little closer to light with a sit stand option with some
limits in respect to his back and his hip about crouching and kneeling, certainly.
The balancing I'm not too sure about. As far as ladders, ropes, and scaffolds, I
would agree that he really shouldn't be doing that. Crawling, again, with his low
back and his hip complaints, I would certainly tend to avoid.

(R. 93.) On questioning from Langley's hearing representative, Dr. Webber allowed that

"anything is possible" in response to an inquiry whether it was possible that Langley has the

limitations described by Dr. Phelps. (R. 92.)

## C. Discussion

Langley maintains that the evidence reliably demonstrates that he is disabled based on the

10

combined impact of chronic pain associated with spinal impairment, hip impairment, and migraines, and mental side effects arising from pain medication. Langley does not separately advance an argument that the Commissioner erroneously evaluated his psychiatric diagnoses as non-severe, except to maintain that his chronic pain and related medication exact a toll on his ability to maintain concentration and handle work-related stress. Nor does Langley maintain that his spinal impairment satisfies or equals a listing.

## 1. *Migraines*

Langley contends that no expert testimony supports the Commissioner's decision to disregard the evidence concerning migraines. (Statement of Errors at 20.) In general, the claimant is responsible for providing the medical evidence needed to support the residual functional capacity finding he advocates, though the Commissioner has an obligation to facilitate the development of the record, such as by arranging for consultative examinations, as needed, and referring the medical records for expert review and assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Judge concluded that the record evidence of migraines did not reliably demonstrate a severe impairment. In support of this finding, the Judge explained:

> The claimant testified that despite medication, he gets headaches "two to six times" a month of such severity that he sometimes has to lie down in a darkened room for relief. The claimant receives primary care at Sebasticook Family Medicine, whose records show that nurse practitioner Lita Bailey-Ford prescribed Maxalt beginning in October 2008 after the claimant reported headache symptoms and noted that the medication Frova "worked within a half hour." Yet, with the exception of one other report of migraine pain in November 2009, there are no other references indicative of headache pain nor any other neurological-related symptoms or issues within the treatment record (Exs. 19F, 24F). Accordingly, with evidence that the claimant's sparsely intermittent headaches are controlled with medication, and lacking any objective data that migraines impose work-related limitations, the impairment is found not severe.

(R. 9.) I find that the Judge's assessment of the migraine question does not call for remand. The Judge gave the issue fair consideration and concluded that the medical records do not reflect

11

more than a sporadic problem that is amenable to treatment with medication. Langley bears the burden of persuasion on the issue and his limited presentation fails to demonstrate a condition that cannot be treated to prevent vocational impairment. Indeed, the medical record suggests just the opposite. That Dr. Webber could not adequately evaluate the issue based on the medical record, that a treatment provider indicated that the problem is amenable to treatment in a reasonable timeframe, and that Langley himself has not substantiated it in his Statement of Errors are all reliable indicators that the Judge's finding is one that a reasonable mind might accept as supported by substantial evidence.

## 2. *Chronic Pain*

According to Langley, the Commissioner's residual functional capacity finding does not adequately reflect Langley's "severe chronic pain," both in terms of the degree to which pain limits mental functioning and in relation to physical exertion, movement, and postures, and that the pain analysis does not follow the proper method of analysis. (Statement of Errors at 9-13, citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)). Langley observes that the step 2 findings erroneously exclude a specific "chronic pain disorder," an impairment specific to his sacroiliac or hip joint, and degenerative joint disease and that, in any event, these should have been reconsidered at the RFC stage even if they are "non-severe" standing alone. (Id. at 12-13.) I fail to understand the error in regard to the Commissioner's failure to find a "chronic pain disorder." Judge Melanson considered Langley's pain symptoms in relation to allegations of both degenerative disk disease and degenerative joint disease with radicular pain in the right hip. That evaluation encapsulates the alleged "chronic pain disorder."

In support of his step 2 finding, the Judge specifically referenced the MRI evidence of "mild degenerative joint disease at L1 through L4 and L5-S1." (R. 9.) Moreover, he

12

appropriately flagged Langley's complaint that he experiences pain radiating into his right hip and intermittent grinding pain. (Id.) Thus, degenerative disk disease and degenerative joint disease are accounted for in the Judge's step 2 finding, including chronic pain situated in the lower back and radiating into the right hip. Additionally, both sources of pain are clearly referenced in the Judge's discussion of his residual functional capacity finding. (R. 12.) The question then becomes whether substantial evidence supports the Judge's residual functional capacity finding.

Judge Melanson's residual functional capacity finding accounts for back and hip pain by restricting Langley to light-exertion work that would permit him to, among other things, adjust between sitting and standing as needed, stay off the floor (no kneel/crawl), and only occasionally balance, stoop, crouch, or climb ramps and stairs. According to Judge Melanson, "the overall data does not reflect the severe level of impairment from pain and restricted mobility that is as debilitating as [Langley] professes." (Id.) The Judge cited Dr. Webber's testimony and the reports offered by Drs. Chamberlin, Nielson, and Stucki in support of his residual functional capacity assessment. A review of their opinions reflects that they are supportive of the Judge's assessment once Dr. Webber's requirement of a sit/stand option is added. In addition to this evidence, the Judge performed a credibility assessment. The administrative law judge has the unenviable duty to make the credibility determination, 20 C.F.R. §§ 404.1529(a), (c)(1), (c)(4), 416.929(a), (c)(1), (c)(4), and in doing so he or she has leeway to consider what the "entire case record" reveals and what reasonable inferences it supports. Id.; see also Soc. Sec. Ruling 96-7p, 1996 WL 374186, *2, 1996 SSR LEXIS 4, *6 (S.S.A. July 2, 1996) ("[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make

13

a finding on the credibility of the individual's statements based on a consideration of the entire case record."). The Court cannot overturn that finding just because it might draw different inferences from the record. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The claimant must demonstrate that the Judge's inferences were unreasonable; the kind of inferences that a reasonable mind would not accept as adequate to support a finding. As the First Circuit Court of Appeals has elsewhere observed: "Where the facts permit diverse inferences, we will affirm the [Commissioner] even if we might have reached a different result." Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, *4, 1994 U.S. App. LEXIS 14287, *14-15 (1st Cir. 1994) (unpublished). Langley does not dissect the Judge's credibility finding but rather argues that it was flawed because it was not a serialized discussion of factors, citing the Avery opinion.

In its Avery opinion, the First Circuit listed a non-exhaustive collection of factors to be considered when evaluating subjective complaints of pain, including:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
> 4. Treatment, other than medication, for relief of pain;
> 5. Functional restrictions;  and
> 6. The claimant's daily activities.

Avery, 797 F.2d at 29. These factors are essentially the same as the factors prescribed in the Commissioner's regulations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In fact, the Judge's discussion touches on each of these factors. Langley, nevertheless, persists that the Judge's discussion is deficient because he failed to assess attention and concentration deficits arising as side effects to pain medication, specifically methadone and ibuprofen. (Statement of Errors at 12.)

14

Dr. Gates offered an assessment that Langley faces "some challenge with concentration and memory that is likely a side effect of medication for pain." (R. 540.) However, she also indicated in the same paragraph that Langley would likely be a reliable worker for work he was physically able to perform. (Id.) Additionally, when she later reevaluated Langley, Dr. Gates indicated that Langley would be "able to manage a mild level of work-related stress and function independently on simple jobs." (R. 617.) Beyond this evaluation, the medical records have little to share on this alleged impairment, except for an assertion offered by Dr. Phelps, described below.

The Judge did not ignore this concern. He addressed it, in particular, in his discussion of attention deficit disorder. The Judge observed that Langley's treatment for this condition, the medication Adderall, controls the symptoms of the disorder and results in improved concentration and intact memory. (R. 10, citing Exs. 4F, 19F, 24F.) Later, the Judge emphasized that his review of the treatment records did not turn up any reports to providers about these symptoms or entries by the providers to the effect that side effects from medications impair Langley's mental status. (R. 12.) Langley's Statement of Errors does not contradict these specific observations. Instead, Langley points to his own testimony, the observations made by Dr. Gates in her reports, and a contention that Dr. Phelps specifically diagnosed attention and concentration deficits arising from pain and medication side effects at page 628 of the record.

Dr. Phelps generated his own medical report form that roughly outlines the physical residual functional capacity form and medical source statements ordinarily used by the Commissioner. However, in between the typical listing of visual/communicative limitations and environmental limitations, Dr. Phelps's form inserts a heading that reads:

> ATTENTION/CONCENTRATION
> Is it medically reasonable to expect that this patient's ability to maintain attention

15

and concentration on work tasks throughout an eight-hour day is significantly
compromised by pain, prescribed medication or both?
YES, BOTH

(R. 628.) It is this opinion that Langley's counsel now points to in support of an argument that the Judge was required to identify countervailing proof from another expert in order to leave such an impairment out of his residual functional capacity finding. However, because Dr. Phelps's report is a report by a consultative examiner (rather than a treatment provider), I am not persuaded that it has a dispositive impact on this case. Moreover, I note that the opinion is not contextualized in terms of whether the alleged impairment rules out, for example, simple work. For these reasons, I regard it as no more than equivalent to the observation offered by Dr. Gates. Dr. Gates has opined that Langley has a capacity for at least simple work despite any relative shortcomings in his attention and concentration.[2] Of course, the Judge did not find that Langley is restricted to simple work or to jobs having little stress. However, for reasons that follow, the Judge's step 5 finding adequately covers these bases because one of the occupations identified by the vocational expert qualifies as both "simple" and "low stress" and exists in substantial numbers in the national economy.

3.  **Ability to Adjust to Other Work**

Because the Judge found that Langley no longer has the functional capacity to return to his former lines of work, the evaluation proceeded to step 5. At step 5, the burden shifted to the Commissioner to demonstrate that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§ 404.1520(g), 419.920(g); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982). Ordinarily, the Commissioner will meet the step 5 burden, or not, "by relying on the

---

[2] This addresses Langley additional point of error, which is that the Judge mishandled Dr. Phelps's findings, emphasizing that, "critically," Dr. Phelps opined that Langley's "pain and medication cause significant deficits in attention and concentration." (Statement of Errors at 15.)

16

testimony of a vocational expert" in response to a hypothetical question whether a person with the claimant's RFC, age, education, and work experience would be able to perform other work existing in the national economy. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). At hearing the Commissioner must transmit a hypothetical to the vocational expert that corresponds to the claimant's RFC. Id.

At Langley's hearing, the vocational expert testified that someone with Langley's residual functional capacity, as found by the Judge, and Langley's vocational profile could successfully transition to work existing in significant numbers in the national economy, including into representative occupations such as:

    Order caller (light), DOT code 209.667-014;

    Assembler, small products II (light), DOT code 739.687-014;

    Touch up screener, printed circuit boards (sedentary), DOT code 726.684-110; and

    Routing clerk (light), DOT code 222.[5]87-03[8].[3]

All of these occupations were described as "SVP 2," meaning that they have a low level of vocational preparation. In addition to these, the vocational expert offered dispatcher, maintenance service (sedentary), DOT code 239.367-014, classified as SVP 3[4] in the Dictionary of Occupational Titles. (R. 94-95.) In response to questioning by Langley's hearing representative, an attorney, the vocational expert testified that none of the identified jobs is "stressful." (R. 97.) Asked why he was asking about the stress levels of these occupations, the representative flagged for the Judge the fact that Dr. Gates had made a reference to simple and

---

[3] The vocational expert supplied an incorrect number, or else the transcriber recorded it incorrectly as 222.687-036.

[4] The vocational expert testified that the dispatcher occupation is really "on the cusp" between SVP 2 and SVP 3, given the nature of the duties involved. (R. 96.) My recommendation does not turn on this assertion.

low stress tasks.[5]  (Id.)

At oral argument, the Commissioner took the position that even if Langley's capacity for exertion falls between sedentary and light, such that the light-duty occupations identified by the vocational expert will not satisfy the step 5 burden, the decision still should be affirmed because the vocational expert identified two sedentary occupations.  Similarly, the Commissioner observed that even if Dr. Gates's opinion is regarded as requiring a restriction to simple and low stress occupations, all but the dispatcher job would remain.  The Commissioner described "simple" as an occupation with a specific vocational profile of 1 or 2.  This was an invitation, I presume, for me to recommend a change in the District's longstanding perspective that the SVP scores do not alone dictate whether a job is simple.  See, e.g., Pepin v. Astrue, No. 2:09-cv-464-GZS, 2010 U.S. Dist. Lexis 98294, 2010 WL 3361841 (D. Me. Aug. 24, 2010); Dana v. Astrue, No. 1:09-cv-514-JAW, 2010 U.S. Dist. Lexis 95814, 2010 WL 3397465 (D. Me. Aug. 24, 2010); Hall-Grover v. Barnhart, No. 03-239-P-C, 2004 U.S. Dist. LEXIS 7634, 2004 WL 1529283, at *4 (D. Me. Apr. 30, 2004) ("SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of the job's simplicity, which appears to be more squarely addressed by the GED ratings.").  I am unwilling to recommend a change in this District's approach based on a brief oral argument, but recognize that many SVP 1 and 2 occupations will have GED ratings of 1 or 2 and, hence, qualify as "simple."  Given the District's approach to what qualifies as "simple" work, I referenced the Dictionary of Occupational Titles to determine whether the two sedentary jobs (touch up screener and maintenance dispatcher) have appropriate GED (general educational development) ratings.  As it happens, the occupation of touch-up screener has reasoning, mathematics, and language GED scores of 2, 1, and 2, respectively, meaning that it qualifies as "simple" as that concept is

---

[5]  The Representative did not flag Dr. Phelps's opinion about attention and concentration.

understood in this District. On the other hand, the dispatcher position has GED scores of 3, 2, and 3, placing it outside of the "simple" category.[6]

The Commissioner may satisfy his step 5 burden with evidence concerning a solitary occupation. 20 C.F.R. §§ 404.1566(b), 416.966(b) (calling for "a significant number of jobs (in one or more occupations)"). In this case, the touch-up screener occupation is sufficient—a low-stress, "simple" occupation with a sit/stand option, that is otherwise consistent with the Judge's residual functional capacity finding—because it exists in substantial numbers in the national economy: "250,000 plus jobs," according to the vocational expert. (R. 95.)

## CONCLUSION

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court affirm the Commissioner's final decision and enter judgment in favor of the Commissioner.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

February 3, 2012

---

[6] For the sake of completeness, the remaining light-duty jobs have the following GED scores attributed to them in the Dictionary of Occupational Titles: order caller (R:2, M:1, L:2); routing clerk (R:2, M:1, L:2). My own review of Dr. Webber's opinion that Langley has a residual functional capacity "closer to light" (R. 93) suggests that Dr. Webber meant that the evidence calls for a sit/stand option and certain postural restrictions, which the Judge credited.